**EASTERN BRICK AND TILE CO., Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 66–449.**

United States District Court
D. South Carolina,
Columbia Division.

Feb. 29, 1968.

---

**218**

Henry B. Richardson, Richardson & James, Sumter, S. C., for plaintiff.

Klyde Robinson, U. S. Atty., Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

DONALD RUSSELL, District Judge.

This is an action under the Federal Tort Claims Act (28 U.S.C.A. §§ 1346 (b) and 2671 et seq.) and arises out of a collision between an engine operated by the defendant over a small spur line near Shaw Air Force Base and a truck and trailer, loaded with certain heavy material, owned by the plaintiff.

On the basis of the testimony taken on trial before me, I make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

In order to provide rail service to Shaw Air Force Base, the defendant maintains and operates a spur line from the main line of the Atlantic Coast Line Railroad near Wedgefield, South Carolina, to the Base, a few miles distant. The spur line crosses two highways. One of these highways is a heavily traveled, four-lane highway from Columbia, South Carolina, to Sumter, South Carolina, designated as Highway 76. The other is a two-lane highway, about 18 feet in width, running between Wedgefield and Sumter, designated as Highway 763. This latter highway, at the point where the spur line crosses it at right angles, is located about seven or eight hundred feet from the main line of the Coast Line and runs parallel with such line; the customary warning signals, erected at the proper locations, were present on both sides of the highway as it approaches the crossing.

There was at the time of the accident herein a growth of small pine trees near the western side of the right-of-way of the spur line between the point where such spur left the Coast Line main tracks and its crossing of Highway 763. However, such pines were not high enough to obscure fully a train proceeding along the spur line between such crossing and the

Coast Line main track from the view of a traveler on the highway approaching, as the plaintiff's driver was, from the direction of Wedgefield.

On the morning of July 7, 1965, a truck and trailer of the plaintiff, loaded with 18 to 20 tons of ceramic material and proceeding along Highway 763 from Wedgefield toward Sumter, struck an engine of the defendant as it was proceeding in the direction of the Base through the crossing over Highway 763 and swerved to the left into a field alongside the spur track. It seems agreed that the speed of the engine at the time was about 6 miles per hour and that at such speed it could have stopped within some 10 or 15 feet. The truck and trailer, according to its driver, had been proceeding at a speed of approximately 35 to 40 miles per hour. As it approached the crossing in question, the driver of the truck decreased his speed in anticipation of a possible train approaching the crossing. When the driver was "maybe a hundred feet, maybe a little further", he conceded he saw the train approaching the crossing but apparently made no effort to stop his truck. His testimony is that, when he first saw the engine it "was going real slow" but that, immediately thereafter, it "increased its speed * * * in order to beat me (him) across the crossing". As the driver explained it, the engine was "going slow enough if he hadn't increased his (its) speed, I would have beat him (it) across the track. Still, when he increased his speed, that just shut the road off on me". It seems doubtful that the driver of the truck ever considered an attempt to stop his truck for the crossing. When asked whether he ever had an intention of stopping, he initially replied, "Well, if they hadn't increased their speed, I would have went across the crossing."

■ The driver of the truck explained his failure to see the engine earlier by the claim that the engine was obscured from his view by the growth of small pines. However, the engineer on the train testified that he could see over the pine trees the plaintiff's truck as it proceeded along the highway and, if he could, the truck driver likewise could have seen the engine. Moreover, the truck driver conceded he could "see a little through the trees"[1] and actually testified that he saw the engine "creeping through the bushes". I conclude that the truck driver saw the engine in ample time to have stopped before reaching the crossing.

The engineer on the defendant's engine, in his version of the accident, conceded that he saw the truck of the defendant, as it approached the crossing, some distance from the crossing. He fixed the speed of the truck, when he first saw it, at "50 to 60 miles an hour". From that point, the driver of the truck "seemed to slow down" and the engineer, according to his testimony "figured he was going to stop". The engineer testified that he did not realize until he was "about ten feet away from the" crossing that the truck was not going to stop. He added he did not immediately apply his emergency brakes because, if he had, he would have stopped in the middle of the crossing, making a collision with the truck certain and inevitable. He concluded that the safest course for him to pursue, having regard for the safety of the truck as well as his own crew was to proceed on, in the hope that he might clear the crossing before the truck reached it. Actually, he almost did this. The truck hit the engine near its rear and had the truck driver applied his brakes, it is likely he might have avoided striking the engine entirely.

■ The engineer testified that he began to sound his whistle and ring his bell about 200 yards from the crossing. The driver of the truck testified that he did not hear either the whistle sound or the bell ring. It is of record that the

---

1. While the truck driver described the small growth of pines as trees, pictures of such growth, taken a year or so after the accident, showed that the term "trees" was somewhat misleading.

driver is now deaf but whether he was deaf at the time of the accident was not established. Whether the truck driver heard it or not, I am satisfied that the engineer did sound the whistle and ring the bell on his engine some distance from the crossing but not within the limits fixed in the South Carolina statute; but such ringing of the bell, or the absence of it, did not contribute to such collision. The driver saw the train; his attention was drawn to it; this was all the giving of the statutory signals could have done by way of warning the driver. Despite this, the driver of the truck concluded he could "beat" the train across and that he attempted to do, without making any effort to stop for the approaching train.

The defendant issued rules for the operation of trains along its spur line. One of these rules dealt with crossings over highways. The language of the rule indicated that, before crossing a highway, the train should stop and a flagman precede the train across the crossing. This, the defendant contended, applied only to the crossing over Highway 76 and was never understood to apply or applied to Highway 763. The plaintiff, however, testified that on all occasions he had noted a train on the crossing over Highway 763, there was a flagman.

The defendant conceded that, when engaged in switching operations about the crossing, it did put a flagman on the crossing but not otherwise. It was not engaged in switching operations on the day of the accident. On this occasion, there was, according to the driver of the truck, a flagman running alongside the engine but he did not precede the train over the crossing. The driver of the truck, however, saw the engine; he apparently knew the engine was proceeding over the crossing; he gauged its speed accordingly and determined he could "beat" it across. He explained the failure to "beat" it across by the circumstance that the engineer, as he described it, accelerated his own speed in order to "beat" the truck across the crossing. In short, according to the driver of the truck, the accident resulted from the

simultaneous attempt by the truck driver and the engineer to "beat" the other across the crossing; unfortunately, it was a "tie". The defendant's witnesses deny that the speed of the engine was increased. I am inclined to regard this as supported by the weight of the testimony.

■ From this testimony, I find the following facts with respect to this accident:

(1) The driver of the truck was not maintaining a proper look-out, nor did he decelerate his truck as he should have in approaching the crossing. If he had, he would have seen the train in ample time to have stopped and could have stopped. As a matter of fact, I think he saw the train in ample time, had he acted promptly, to have stopped, but inaccurately concluded from the slow speed of the train that he could "beat it" across the crossing and that he tried to do.

■ (2) The failure of the defendant to give the statutory signals for the full distance of 850 feet prior to reaching the crossing was not a cause of the accident. The driver of the truck saw the engine in ample time to have stopped, had he not chosen to attempt to "beat" the engine across.

(3) The rules issued by the defendant for the operation of trains along the spur line did not, as construed by both those issuing and those observing such rules, require a flagman at the crossing over Highway 763. Even if such rules did so require, the presence of such a flagman would not have caused the driver of the truck to have stopped; he saw the train but proceeded because he thought he could "beat" the train across. It is unlikely that his conclusion would have been different, even had a flagman been present.

(4) After he saw the engine, the driver of the truck had ample opportunity, had he used appropriate care and vigilance, to have stopped his truck and avoided the collision. There is no evidence that his speed was such that he could not have stopped or that his brakes

were defective in any way. He chose not to stop but to proceed in the face of the approaching engine.

## CONCLUSIONS OF LAW

As the Court remarked in Robison v. Atlantic Coast Line R. Co. (1936) 179 S.C. 493, 501 and 504, 184 S.E. 96, "it is always train time at a railroad crossing"; and, at such crossing the right of the railroad "is superior to the right of a traveler upon a highway". See, to the same effect, Chisolm v. Seaboard Air Line Railway Company (1922) 121 S.C. 394, 401, 114 S.E. 500. Accordingly, "It is the duty of a traveler, upon the approach to a railroad crossing of which he is aware, to use due care to observe the approach of trains at said crossing." Breeden v. Rockingham R. Co. (1940) 193 S.C. 220, 224, 8 S.E.2d 366, 368. As the Court added in this case, "It cannot be doubted, therefore, that one who approaches a railroad crossing with which he is entirely familiar, in the daylight, where the view of approaching trains, to his knowledge, is obstructed until a point is reached approximately thirty feet from the railroad tracks in an automobile at a speed of thirty to thirty-five miles per hour, without slackening his speed or taking any precautions to have his automobile under such control at a point where he could obtain a view of an approaching train as to be able to stop before reaching the crossing is guilty, as a matter of law, not only of negligence, but of gross negligence." (p. 225, 8 S.E. 2d p. 368) See, also, Osborne v. Southern Railway Company (D.C.S.C.1967) 263 F.Supp. 718, 723–724.

And the employees of a railroad, observing a vehicle approaching a railroad crossing, in the face of an oncoming train, have a right to assume that the driver of such vehicle will observe due care and "will stop in a place of safety" and are "not required to slacken the speed of" their train on the assumption that such driver will drive onto the track in the face of the oncoming train. Melton v. Atlantic Coast Line R. Co. (1943) 206 S.C. 251, 258–259, 27 S.E.2d 490.

But the fact that the railroad has superior rights at a crossing "does not relieve the company (railroad) of reasonable and ordinary caution to prevent accidents at such crossing * * *." Robison v. Atlantic Coast Line R. Co., supra, 179 S.C. at p. 504, 184 S.E. at p. 101. Specifically, the doctrine of "last clear chance" prevails in South Carolina, a doctrine which was enunciated in Bruin v. Tribble (C.C.A.S.C.1956) 238 F.2d 12, 13, as holding that "a negligent plaintiff (traveler) may recover if the defendant has the last clear chance to avoid the accident by exercise of due care if he realizes, or should have realized, that the plaintiff is inattentive or unaware of the danger." To the same effect: Fletcher v. South Carolina & G. E. Railroad Co. (1900) 57 S.C. 205, 207–209, 35 S.E. 513; Seay v. Southern Ry.-Carolina Division (1944) 205 S.C. 162, 174–175, 31 S.E.2d 133; Jones v. Atlanta-Charlotte Air Line R. Co. (1951) 218 S.C. 537, 546–551, 63 S.E.2d 476, 26 A.L.R.2d 297; Greene v. Miller (D.C.S.C. 1953) 114 F.Supp. 150, 155. This principle, however, "constitutes no exception to the general doctrine of contributory negligence, and does not permit one to recover in spite of contributory negligence. It merely operates to relieve the negligence of a plaintiff, which would otherwise be regarded as contributory, from its character as such. This is accomplished by characterizing the negligence of a defendant, if it intervenes between the negligence of the plaintiff and the accident, as the sole proximate cause of the injury, and the plaintiff's antecedent negligence as a condition or remote cause." Seay v. Southern Ry.-Carolina Division, supra, 205 S.C. at p. 175, 31 S.E.2d at p. 138.

In line with this statement of the doctrine in the Seay Case, the essential elements of the last clear chance rule, as it applies in South Carolina, were summarized in Jones v. Atlanta-Charlotte Air Line R. Co., supra, 218 S.C. at p. 548, 63 S.E.2d at p. 480 as follows:

"A plaintiff who has negligently subjected himself to a risk of harm from

the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

"(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and

"(b) the defendant

"1. knows of the plaintiff's situation and realizes the helpless peril involved therein; or

"2. knows of the plaintiff's situation and has reason to realize the peril involved therein; or

"3. would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise, and

"(c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff.

"Decisions in conformity with the foregoing hold that one is incapable of care if prostrate from intoxication or other cause, and within the rule if the other factors are present."

■ Applying these principles of law to the facts in this case, it seems indisputable that the driver of the truck was guilty of gross negligence. Little weight is to be given his testimony that the statutory signals were not given or that his view of the approaching train was obscured by the growth of small pines. Admittedly, he knew the crossing; he saw the train "creeping", as he described it, through the pines towards the crossing; he gauged its speed, and determined he could "beat" it across. His action may be likened to that of the bicyclist in the *Robinson* Case, supra, 179 S.C. p. 504, 184 S.E. at p. 101, who exclaimed, "We can make it; let's go". In both cases, they failed to "make it"; in both cases, the reason was their own attempt to outdistance a train they plainly observed across the crossing. Both "acted in utter disregard of his (their) own safety." Atlantic Coast Line R. Co. v. Glenn (C.C. A.S.C.1952) 198 F.2d 232, 234.

■ In this case, the truck driver's excuse is that he would have made it across, if the engine had not increased substantially its speed in an attempt to cross the highway before the truck reached it. I have already indicated that I did not believe the engineer increased the speed of his engine as he neared the crossing. I think this conclusion of the truck driver represented a rationalization of his failure to "beat" the train across. Equally without point is the argument of the plaintiff that, the defendant, by failing to have a flagman precede its engine across the crossing as required by its own operating rules and by failing to observe a custom of having a flagman at such crossing, induced the truck driver to assume mistakenly that no engine was approaching the crossing. Recognizing the principle that self-imposed rules may well be deemed a defendant's own idea of the standard of care required and, if violated, constitute evidence of negligence (McCormick v. Columbia Electric Street Railway Light & Power Co. (1910) 85 S.C. 455, 459–460, 67 S.E. 562, 21 Ann. Cas. 144; Gillis v. Atlantic Coast Line R. Co. (1934) 175 S.C. 223, 228, 179 S. E. 62; Annotation, 50 A.L.R.2d 16), that principle is inapplicable here. The truck driver was not misled (or "lured", as some of the cases express it) into assuming that no train was about the crossing by the defendant's failure to have a flagman present; he concededly saw the engine and he saw it even before it emerged from the area where there was a growth of small pines. Baldly stated, he saw the engine but inaccurately assumed he could "beat" it across. The error was his. He was the victim of his own gross negligence.

■ Nor can the plaintiff avail itself on the facts of this case of the doctrine of last clear chance. As the *Seay* Case observed, 205 S.C. p. 175, 31 S.E.2d p. 138, this doctrine "does not permit one to recover in spite of contributory negligence." The first requirement of such principle, as phrased in the *Jones*

Case, is that he who relies on the doctrine, was, immediately preceding the accident, "unable to avoid it (the accident) by the exercise of reasonable vigilance and care". (218 S.C. p. 548, 63 S.E.2d p. 480) The record here indicates that the driver of the truck at no time endeavored to apply his brakes or to stop his truck; he seemed determined to get across ahead of the engine. He neither anticipated nor expected the train to stop before the crossing. At no time did he testify that, had he attempted, he could not have stopped the truck before reaching the crossing, after he had observed the engine approaching the crossing. He would excuse such failure by his claim that the engine unexpectedly was accelerated, a fact denied by the defendant's witnesses and a fact I find unconvincing. I feel compelled to conclude that the plaintiff has not sustained the burden of proving that immediately preceding the accident, the truck driver was unable to avoid the accident by the exercise of "reasonable vigilance and care". See, Graham v. Seaboard Air Line Railroad Company (D.C.S.C.1966) 250 F.Supp. 566, 574; Page v. United States (D.C.S.C.1963) 212 F.Supp. 668, 670.

I conclude, as the Court concluded in Bishop v. Atlantic Coast Line R. Co. (1948) 213 S.C. 125, 140–141, 48 S.E.2d 620, 627, that the last clear chance doctrine "is not applicable to the facts of this case. We think the only inference to be drawn from this testimony is that the deceased (in this case, the truck driver) was guilty of concurrent and continuing negligence up to the time of the collision. Truett v. Atlantic Coast Line Railway Co., 206 S.C. 144, 33 S.E.2d 396. It would seem illogical to hold that due care by respondents (the defendant) would have prevented the accident and yet ignore the correlative fact that due care by the decedent (the truck driver here) would also have prevented it."

Let judgment be entered for the defendant, and

It is so ordered.